**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| BOYCE BALLINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:12-CV-309-TLS |
| | ) | |
| CITY OF FORT WAYNE, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, Boyce Ballinger, alleges that his employer, the Fort Wayne Police

Department, retaliated against him in violation of the Americans with Disabilities Act (ADA) by

assigning him to light duty pending the outcome of a fitness for duty evaluation.[1] The parties

proceeded to a bench trial, which was held on April 28–29, 2015. Pursuant to Federal Rule of

Civil Procedure 52(a), the Court, after observing the witnesses at trial and reviewing the trial

exhibits, transcripts, and briefing submitted by the parties, enters the following written findings

of facts and conclusions of law.

## FINDINGS OF FACT

Since 2003, the Plaintiff has been employed by the Fort Wayne Police Department

(FWPD) as a patrol officer. From 2006 to 2011, the Plaintiff was assigned to the FWPD's

northeast quadrant. Prior to his employment with the FWPD, the Plaintiff served as a patrol

officer in Lima, Ohio.

---

[1]The Plaintiff also alleged ADA claims for discrimination, unlawful medical inquiry, and breach of confidentiality [Compl., ECF No. 1]. Each claim was dismissed by joint stipulation. [ECF Nos. 22, 55, & 64.]

**A.     Anonymous Note in Plaintiff's Mailbox**

On July 29, 2010, the Plaintiff found an informational flyer for the Teamsters Union in his mailbox at the northeast quadrant outpost. The back of the flyer contained the following anonymous note: "Go back to Ohio, Mr. Miserable." Another patrol officer, Robert Elmer, found an identical flyer in his mailbox at the same outpost. The back of Elmer's flyer contained an anonymous note that said, "Fuck You." According to the Plaintiff, prior to receiving his note, he attended an informational meeting for the Teamsters Union, which upset some of his co-workers.[2]

In light of the note, the Plaintiff met with Lieutenant Kevin Hunter and Sergeant David Nelson from the FWPD's Internal Affairs and Office of Professional Standards, which is responsible for investigating allegations of misconduct or complaints against officers. According to Nelson, the Plaintiff was "visibly upset." (Nelson Test. 176.) The Plaintiff said he feared for his personal safety because his fellow officers may not "back him up." (Hunter Test. 33–34.) The Plaintiff elaborated at trial, testifying that "[w]hoever wrote that note would probably want to see me get harmed." (Pl's Test. 90.) He also told Hunter and Nelson that he feared being unable "to pull the trigger" in a deadly force situation. (Nelson Test. 179.) As a result, the Plaintiff said he wished "to go home because [he] didn't feel safe." (Pl's Test. 91.) Unlike the Plaintiff, neither

---

[2]The Plaintiff testified that, during this time, the Patrolmen's Benevolent Association was the representative union for the FWPD. When asked what the purpose was for attending the Teamsters Union meeting, the Plaintiff explained:

> We had an open contract with the City of Fort Wayne. And when we have an open contract, you can bring in another union to represent you if you're unhappy with the current one that you have. So I went to go get more information from this other organization to see if they could better serve us.

(Pl's Test. 84–85.)

Hunter nor Nelson perceived the note as a threat. At trial, Hunter said he believed the Defendant was acting "paranoid." (Hunter Test. 35.)

The Plaintiff requested and was granted sick leave from July 29 to August 5, 2010. The Plaintiff also requested an investigation into the note. The investigation, which included fingerprint testing, failed to identify any suspects.

## B.     Plaintiff's Return from Sick Leave

The Plaintiff returned from sick leave on August 6, 2010. In accordance with internal policy, the Plaintiff submitted an "Illness-Injury Statement," signed by his physician, which indicated that he suffered from headaches, insomnia, irritable bowel syndrome, and depression. The Plaintiff informed Hunter that he was treating his depression by taking medication (Lexapro) and seeing a doctor. Because the Plaintiff had not previously taken Lexapro, he was placed on light duty for one night (August 6) to ensure that he could safely operate a patrol vehicle.

On or about August 9, 2010, the Plaintiff took paternity leave until August 24, 2010. Upon returning from paternity leave, the Plaintiff was interviewed by Nelson. He informed Nelson that, due to his medication, he was feeling better and could perform his duties as a patrol officer. However, according to Nelson, the Plaintiff "was still leery of [his fellow] officers." (Nelson Test. 197). In Nelson's view, such fears were unjustified. (*See id.* at 197–198 ("I think officers will back you up. They may not like you, you may be leery of them, but in my experience, officers will back you up . . . you could see [the Plaintiff's belief of officers not backing him up] as maybe a paranoid thought.").)

Then, on September 26, 2010, the Plaintiff filed two allegations of misconduct against Sergeant William Michael, who also worked in the northeast quadrant.[3] At trial, the Plaintiff stated his belief that Sergeant Michael wrote the note. Lieutenant Michael McQueen, the Plaintiff's shift commander, said the Plaintiff's issues with Sergeant Michael continued into 2011:

> [The Plaintiff] called me one night after I was off duty on my cell phone, and was highly agitated and told me that he was concerned because Sergeant Michael had asked another Sergeant on C-shift to review one of [the Plaintiff's] reports to see if his name was listed in the report. And as we discussed that, I didn't really understand what the issue was, but as we discussed it, [the Plaintiff] told me he was having difficulties with people in the northeast division, and he concluded it by telling me that he feared for his life.
>
> Subsequently, I told him that I would look into it, I did so the next day. I talked to Sergeant Michael. He explained to me that he had given direction to [the Plaintiff] and wasn't certain that [the Plaintiff] agreed with it, and was concerned that [the Plaintiff] may put something in his report negative towards Sergeant Michael. He asked another Sergeant . . . to review the report, which he did.

(McQueen Test. 234–35.) According to McQueen, he has "fielded a number of complaints from officers where there have been personality clashes, disagreements within working groups, but in all those years, [he had] never had anyone tell [him] that they feared for their life." (*Id.* 3.)

---

[3]Hunter described the Plaintiff's allegations against Sergeant Michael in a report dated August 1, 2012:

> The first allegation of misconduct against Sgt. Michael involved . . . [the Plaintiff taking] exception with Sgt. Michael's response on a party armed call and [feeling] that Sgt. Michael "does not have [the Plaintiff's] safety or best interest in mind." He also felt that Sgt. Michael was the person who placed the disparaging [note] in [the Plaintiff's] mailbox. The second allegation of misconduct . . . involved an incident involving a domestic dispute. [The Plaintiff] and Sgt. Michael did not agree on the seriousness (or lack of) on this call. Sgt. Michael believed the incident was minor in nature and [the Plaintiff] did not.

(Pl's Ex. 29.) Hunter reviewed the Plaintiff's allegations and determined that they lacked adequate support. The Plaintiff was notified of Hunter's determination on November 4, 2010.

The Plaintiff also had personal issues with Officer Jay Luce. In late August 2011, the Plaintiff pulled over Luce's mother during a traffic stop. Luce complained to Sergeant Michael because he "felt that [the Plaintiff] was targeting [his mother] because of personal differences between the two." (*Id.* 13.) After using the FWPD's GPS monitoring system to track the prior movements of the Plaintiff's patrol vehicle on the day in question, McQueen determined that "there was no appearance of laying and wait [sic]" and that the Plaintiff "just simply happened to be at that place at the same time she was." (*Id.* 13–14.)

Around this time period, the Plaintiff submitted a bid for a transfer to the northwest quadrant. The Plaintiff's bid was delayed, however, because the Assistant Chief of Police was unavailable. Hunter explained the circumstances at trial:

> There were several bids that all went out at the same time, one of those being a bid that [the Plaintiff] put in for. The Assistant Chief who typically awards those bids was off sick . . . [s]ome of those bids were in the Detective Bureau, and a captain in the Detective Bureau asked to have those bids awarded so that the officers could be placed into those positions. Some of those bids were awarded. [The Plaintiff's] bid was not, only because the Assistant Chief was off sick.

(Hunter Test. 151–52.) According to the Plaintiff, prior to September 8, 2011, he was not provided an explanation for the delay.

## C.    Letter from the Plaintiff's Attorney

On September 8, 2011, the Plaintiff's attorney, Lori Jansen, sent a letter to Chief of Police Rusty York, alleging that the Plaintiff "received derogatory notes and retaliatory treatment" ever since he notified Hunter of his depression in August 2010.[4] (Pl's Ex. 14.) The

---

[4]Jansen also sent the letter on behalf of Elmer, the other recipient of an anonymous note, who alleged discriminatory treatment by the Defendant. Elmer eventually filed suit against the City of Fort

letter described the "retaliatory treatment" as follows:

> In September 2011, [the Plaintiff] found out that he has unsigned write-ups in his file. [The Plaintiff] has also become aware that in late August 2011 his GPS was being monitored and his activities had been followed for "shifts and shifts and shifts." Recently, [the Plaintiff] successfully bid for a position in the northwest part of town. The bid that he won went unawarded, while two bids from the same issue day were awarded. As recently as September 5, 2011, a bid that was posted *after* [the Plaintiff's] was awarded, while he still waited for his bid.

(*Id.*) The letter indicated that, in lieu of litigation, the Plaintiff's preference "is just to be left alone to do [his job] with the knowledge that [he] will receive back up and support from [his] fellow officers." (*Id.*)

Consistent with internal policy, York reviewed the letter and forwarded it to Internal Affairs. On or about September 13, 2011, the Plaintiff was awarded his bid for a transfer to the northwest quadrant.

## D.    Car Accident and the Plaintiff's Response

On September 22, 2011, the Plaintiff, while on duty, received a call from his wife, informing him that she required medical treatment because she was having difficulty breathing. His wife had recently been diagnosed with pneumonia and pleurisy. (Pl's Ex. 20.) The Plaintiff feared that she had "cracked a rib" or "punctured a lung" from coughing. (*Id.*) The Plaintiff contacted McQueen and requested that he be relieved from duty to transport his wife to the hospital. McQueen granted the request.

While driving home to assist his wife, the Plaintiff came upon a vehicle in the middle of

---

Wayne on September 4, 2012. *See Elmer v. City of Fort Wayne* (1:12-cv-298). The case proceeded to a two-day bench trial in front of Judge Robert L. Miller, who entered judgment in favor of the Defendant.

an intersection. He described the scenario at trial:

> When I first pulled up, traffic was kind of backed up. As traffic cleared I got up to the intersection and I saw a car in front of me blocking my lane of travel. The lady was on her cell phone and looking up from the light. From my experience from working the area, I thought she was caught in traffic . . . I turned on my lights, then I waved for her to go, because I didn't know she thought the traffic was clear for her to go and then I yelled go, go, because I could see there was no one that would come and hit her . . . [a]fter the vehicle safely turned left . . . [I] turned my lights off and continued homeward.

(Pl's Test. 114–15.)

After leaving the scene, the Plaintiff overheard via his police radio that an officer was dispatched to the same intersection. The Plaintiff then saw on the computer screen in his patrol vehicle that a citizen had reported a police officer leaving the scene of an accident. The Plaintiff contacted McQueen and informed him of the situation. The Plaintiff explained to McQueen that he was unaware an accident had taken place. McQueen described the conversation:

> I told [the Plaintiff] . . . that we had already dispatched a car to work the accident. He told me he was going to turn around and go back, and I said it wasn't necessary, he could continue on. Then he told me that he was afraid that he would be in trouble if he continued home to take his wife to the hospital . . . I again told him I was aware of the circumstances. I understood that due to his concern for his wife that . . . he needed to realize it was an accident and he wasn't in any trouble, that as far as I was concerned that answered it. He again told me that he was afraid of what . . . may happen and, again, I told him that it was all right, that nothing was going to happen. So at that point, I assumed that he was continuing on his way home to take care of his wife.

(McQueen Test. 232–33.) McQueen said he did not use the term "direct order" because he did not want to "escalate" the situation by "add[ing] to [the Plaintiff's] agitation." (*Id.* 24–25.) Despite McQueen's request, the Plaintiff returned to the scene.

At some point, either before or after returning to the scene, the Plaintiff learned that Luce was the dispatched officer. The Plaintiff contacted Officer Elmer—first by radio, and then by

cell phone—to tell him that "[Luce] was on the way to the crash and that [the Plaintiff] was afraid that . . . [Luce] might attempt to get [the Plaintiff] in trouble by either not working the crash or causing a citizen to complain." (Pl's Test. 122.) The Plaintiff asked Elmer, who at the time was working in the northwest quadrant, if he could respond to the accident. According to McQueen, he was unaware of any other officer making a similar request. (*See* McQueen 34 ("[Defense Counsel:] Have you ever known an officer in your, at least, 16 years as a Lieutenant to request another officer to work a traffic accident when one had already been dispatched? [McQueen:] . . . no, I haven't.").) The Plaintiff also contacted his wife, telling her that he must "go back [to the scene] and make sure that [Luce] doesn't make this worse than what it is" because of their "past problems." (Pl's Test. 119.) According to the Plaintiff, his wife told him that she was feeling better and was able to contact her mother. The Plaintiff testified that he no longer considered his wife's health situation as an emergency. However, McQueen testified that the Plaintiff never relayed this information to him.

Upon Luce's arrival, Luce said to the Plaintiff "'You got this, buddy,'" to which the Plaintiff responded "'I got this." (*Id.* 122–23.) Luce left the scene and the Plaintiff completed the response. The Plaintiff then drove home to assist his wife. McQueen was first notified of the Plaintiff's return to the scene by Sergeant Michael, who said Luce "had made contact with [the Plaintiff], and advised him that upon his arrival, [the Plaintiff] was still on the scene and that [the Plaintiff] told him that he was going to . . . take the accident." (McQueen Test. 233.) The Plaintiff, said McQueen, was "the first [officer] that has blatantly disregarded an order [given by him] under . . . circumstances where another emergency existed." (*Id.* 19.) The Plaintiff testified that he did not interpret McQueen's request to be an order.

**E.      Meeting with Hunter and McQueen**

The day following the accident, the Plaintiff met with Hunter and McQueen. According to McQueen, the Plaintiff appeared "agitated." (*See Id.* 11 ("[Plaintiff's Counsel:] And what did he do that made you believe that he was agitated? [McQueen:] Standing very rigidly when he first entered the room. I asked him to have a seat in an attempt to relax the atmosphere. Speaking very rapidly, speaking in a much louder voice than what was normal for [the Plaintiff], looking at the floor, looking from side to side."). During the meeting, McQueen expressed concern regarding the Plaintiff's refusal to leave the accident scene after being requested to do so. McQueen described the meeting:

> [The Plaintiff] told me that the reason that he didn't go off duty . . . was because he was afraid of what people would say, that he was afraid he would be in trouble. And again, I explained to him he wasn't in any trouble for driving past the accident, it was understandable . . . [the Plaintiff then] brought up other issues that he had had with officers in the northeast division over a period of time . . . and he told me he was afraid of what Officer Luce might put in his report. I pointed out that the report was an accident report, which is essentially fill-in-the-blank, there's very little opportunity to editorialize in it, and I didn't feel there was anything Officer Luce could have put in the report derogatory towards [the Plaintiff].
>
> *                *                *
>
> I told [the Plaintiff] I didn't understand . . . his concern about what people would say and why he would disobey the order. At that point, he looked at the floor, kind of leaned over in the chair, and didn't respond for . . . a period of time where he had been so agitated before and talking rapidly, now had a big pause and stared at the floor and then smiled at the floor. And then when I asked what he was smiling about, he looked up and looked from side to side, didn't look directly at me, and said . . . "I can see where this is going. I think I need representation."

(*Id.* 34–35, 233.) When asked if he found the Plaintiff's behavior concerning, McQueen said "Yes." (*Id.* 35.)

Hunter and McQueen also met with Luce, who said he turned on his car camera and body

microphone at the scene to record any interaction between he and the Plaintiff. Luce said he did this "for his protection." (Hunter Test. 61.) McQueen reviewed the video recording prior to his meeting with the Plaintiff.

## F.     The Plaintiff's Placement on Light Duty

Following the September 23 meeting with the Plaintiff, McQueen sent an e-mail to Hunter, recommending that the Plaintiff submit to a fitness for duty evaluation. Pursuant to the FWPD's Rules and Regulations, "[i]n the event of the failure of [an] officer to perform his assigned duties, the Chief [of Police] may order the officer to take appropriate tests to determine the officer's fitness for duty."[5] (Pl's Ex. 3.) McQueen's e-mail stated, in part:

> I feel that [the Plaintiff's] fitness for duty should be reviewed and evaluated since he has been displaying aberrant behavior, feels that there is some type of [northeast quadrant] conspiracy and has by his actions and admissions refused to work with not just individual officers but whole quadrants. He also disobeyed my orders due to his paranoia.

(Pl's Ex. 19.) McQueen said his recommendation was prompted by three incidents: (1) the Plaintiff's allegations against Sergeant Michael; (2) the car accident on September 22, 2011; and (3) the meeting on September 23, 2011. McQueen was unaware of the letter from the Plaintiff's attorney when he made his recommendation.

Hunter concurred with McQueen's assessment, testifying that he was concerned the Plaintiff posed a "possible threat . . . [t]o public safety." (Hunter 87–88.) Hunter recommended the Plaintiff's placement on light duty via e-mail (with attached documentation from McQueen)

---

[5] During Hunter's tenure as Lieutenant in Internal Affairs—from January 2010 to August of 2012—11 officers had submitted to a fitness for duty evaluation.

to Chief York. Hunter said his recommendation was based on the "totality of the circumstances," including the anonymous note incident on July 29, 2010, the Plaintiff's Injury-Illness Statement, the contents of the Jansen letter, the accident on September 22, 2011, and the follow-up meeting on September 23, 2011. (*Id.* 85.) But according to Hunter, McQueen's recommendation was the determinative factor. (*See Id.* 153 ("[Defense Counsel:] [W]ould you have sent [the Plaintiff] for a fitness for duty evaluation if you hadn't received the email from Lieutenant McQueen? [Hunter:] No, sir, I would not.").) York, relying on Hunter's recommendation, agreed to the fitness for duty evaluation.

In a case summary report, dated October 20, 2011, Hunter referenced the Plaintiff's allegations in the letter from counsel:

> (Note-[the Plaintiff] has not informed the Internal Affairs office of any other derogatory notes he has received since the first incident on August 6, 2010. There were no unsigned "write-ups" in [the Plaintiff's] file, only documents that detailed information for evaluation purposes, not discipline. To my knowledge, [the Plaintiff] did not have his GPS monitored in August for "shifts and shifts and shifts." The un-awarded bid issue was due to the Assistant Chief being off work. The bid was awarded to [the Plaintiff] upon the Assistant Chief's return to work.)

(Def's Ex. F.) The report also included Hunter's observations regarding the Plaintiff's behavior on September 22–23, 2011:

> (Note-[the Plaintiff's] responses [during the September 23 meeting] were concerning to me. During the crash incident, [the Plaintiff's] paranoia appears to have delayed him from taking his wife to the hospital, so that he avoided having another officer's [sic] possibly say or write bad things about him.

(*Id.*)

On September 28, 2011, during a meeting, Hunter informed the Plaintiff of his assignment to light duty pending the outcome of a fitness for duty evaluation. According to the Plaintiff, Nelson, who also attended the meeting, picked up the letter at one point and said, "you

know, your own doctor says you have depression." (Pl's Test. 133.)

While on light duty, the Plaintiff was permitted to carry his firearm and badge, but was not permitted to work on patrol, drive his patrol vehicle, wear a uniform, or engage in part-time employment.[6] The Plaintiff was assigned to the police desk, but he later sought, and was granted a transfer to the evidence/property room. According to Hunter, a fight had occurred at the police desk, and the Plaintiff "was afraid about getting involved in direct confrontation with somebody." (Hunter 140–41.) The Plaintiff also sought transfer because of an ongoing theft investigation at the police desk.

On October 21, 2011, Dr. Gregory Hale performed a mental fitness for duty evaluation on the Plaintiff; and on November 11, 2011, Dr. Hale submitted his report to Hunter. The Plaintiff reviewed Dr. Hale's report, requested certain non-substantive changes, and submitted additional medical records. On or about December 7, 2011, the Defendant received a supplemental report from Dr. Hale, clearing the Plaintiff for a return to full duty. The Defendant cleared the Plaintiff for full duty that same day. However, at the Plaintiff's request, he remained on light duty to complete a project in the property/evidence room. The Plaintiff returned to full duty on December 11, 2011.

**ANALYSIS**

An ADA retaliation claim requires the Plaintiff to show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) there is a causal connection between the two. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595,

---

[6]The Plaintiff was employed as a part-time security guard during the relevant time period.

601 (7th Cir. 2011). There is no dispute that the Plaintiff engaged in a statutorily protected activity when he submitted, through his attorney, the September 8, 2011, letter alleging discriminatory treatment by the Defendant. There is also no dispute that the Plaintiff suffered an adverse employment action when he was assigned to light duty pending the outcome of a fitness for duty evaluation. The sole issue is whether a causal connection exists between the statutorily protected activity and the adverse employment action.

In *Univ. of Texas Southwestern Medical Center v. Nassar*, the Supreme Court held that to prevail on a Title VII retaliation claim, a plaintiff must meet the "traditional principles of but-for causation," and that showing the protected activity was a "substantial motivating factor" in a retaliatory action was insufficient. 133 S. Ct. 2517, 2533 (2013); *cf. Hoppe v. Lewis Univ.*, 692 F.3d 833, 842 (7th Cir. 2012) (applying the pre-*Nassar* standard that a causal connection requires evidence that the protected activity was "a substantial motivating factor" in an adverse employment action). Several circuit courts—along with district courts in this Circuit—have also applied *Nassar* in the context of ADA retaliation claims. *See, e.g., T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 795 F.3d 1067, 1088 (9th Cir. 2015); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc)*; Staley v. Gruenberg*, 575 F. App'x 153, 155 (4th Cir. 2014)*; Feist v. La., Dep't of Justice, Office of Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013); *Nayak v. St. Vincent Hosp. and Health Care Ctr., Inc.*, No. 1:12-cv-817, 2014 WL 3942362, at *1 (S.D. Ind. Aug. 12, 2014); *Hillman v. City of Chi.*, 14 F. Supp. 3d 1152, 1179 (N.D. Ill. 2014). However, the Court need not determine whether *Nasser* is applicable to the Plaintiff's ADA retaliation claim, for even if the more lenient "substantial motivating factor" standard is applied, the Plaintiff has failed to prove a causal connection between the letter and his

assignment to light duty.

As a preliminary matter, the Court is mindful that, generally, decisions related to mental health evaluations in the public safety context are entitled to deference. *See, e.g., Krocka v. City of Chi.*, 203 F.3d 507, 515 (7th Cir. 2000) (finding that "[t]he position of Chicago police officer certainly presents significant safety concerns, not only for other [police department] employees but for the public at large" and that "[i]t was entirely reasonable, and even responsible . . . for the [police department] to evaluate [the plaintiff's] fitness for duty once it learned that he was experiencing difficulties with his mental health."). Here, the record shows that over a roughly 14-month period, the Plaintiff engaged in a pattern of unusual behavior, driven in large part by his fear and suspicion of fellow officers. At trial, Hunter offered credible testimony that, based on a cumulative assessment of the Plaintiff's behavior and circumstances—including the Plaintiff's multiple and ongoing expressions of distrust toward his fellow officers; his allegations of GPS monitoring for "shifts and shifts and shifts"; his questionable actions during the car accident; and his diagnosis of depression—Hunter believed the Plaintiff posed a "possible threat . . . [to] public safety," (Hunter 87–88), and thus, he recommended a fitness for duty evaluation.

The Plaintiff contends, however, that "[t]he most compelling evidence" of causation "is Hunter's admission that he considered the letter" when making his recommendation to Chief York. (Pl's Br. 8, ECF No. 70.) This argument is unavailing. Despite the fact that the letter was just one consideration among many, the Court deems credible Hunter's testimony that his consideration of the letter was limited to its content; namely, information that cast further doubt on the Plaintiff's mental health. (*See* Hunter Test. 152 ("[In the letter], I considered that his Attorney stated that he had depression and that he thought he was being monitored on his GPS

for 'shifts and shifts and shifts,' which again, to my knowledge is not accurate. [Defense

Counsel:] So was it the fact of the letter or the information contained in the letter that was

relevant to your consideration? [Hunter:] It was the information in the letter.").) Moreover,

Hunter testified that the determinative factor was McQueen's recommendation. (*See id.* 153

("[Defense Counsel:] [W]ould you have sent [the Plaintiff] for a fitness for duty evaluation if

you hadn't received the email from Lieutenant McQueen? [Hunter:] No, sir, I would not.").)

Neither party disputes that McQueen was unaware of the letter when he made his

recommendation.

  The Plaintiff also argues that an "inference of causation" can be drawn from the timing of

the letter and the Plaintiff's assignment to light duty. (Pl's Br. 9.) "For an inference of causation

to be drawn solely on the basis of a suspicious-timing argument, [a court should] typically allow

no more than a few days to elapse between the protected activity and the adverse action."

*Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012); *see Loudermilk v. Best Pallet Co.,*

*LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011) (holding that a worker who handed his supervisor a

note that complained of workplace discrimination and was immediately fired had established an

inference of causation by way of suspicious timing); *Casna v. City of Loves Park*, 574 F.3d 420,

422–23, 427 (7th Cir. 2009) (holding that a one-day time period between the employee's

complaint and her supervisor's recommendation to fire her was sufficient). Additionally, "where

a significant intervening event separates an employee's protected activity from the adverse

employment action he receives, a suspicious-timing argument will not prevail. *Kidwell*, 679 F.3d

at 967 (internal quotation marks and brackets omitted); *Davis v. Time Warner Cable of Se. Wis.,*

*L.P.*, 651 F.3d 664, 675 (7th Cir. 2011).

Here, the time gap between the letter and the Plaintiff's placement on light duty—20 days—extends beyond just "a few days." *Kidwell*, 679 F.3d at 966. But notwithstanding, the Plaintiff's light duty assignment was preceded by a significant intervening event: the accident on September 22, 2011. The record suggests that the Plaintiff's decision to disregard his commanding officer's request to go off-duty in the midst of an apparent medical emergency involving his wife, coupled with his suspicious behavior at the follow-up meeting on September 23, led to his placement on light duty. According to McQueen, the Plaintiff was "the first [officer] that has blatantly disregarded an order [given by him] under . . . circumstances where another emergency existed." (McQueen Test. 19.) The record also shows that at the follow-up meeting, the Plaintiff informed Hunter and McQueen that his response was motivated by his leeriness toward fellow officers, which both Hunter and McQueen deemed to be "concerning." (*Id.* 35; Def's Ex. F.)

The Plaintiff also points to alleged deviations from the Defendant's internal policies. Specifically, the Defendant claims that, inconsistent with internal policy, the Defendant failed to (1) identify a job duty that the Plaintiff was unable to perform; (2) take away the Plaintiff's firearm while awaiting the results of the fitness for duty examination; or (3) obtain a doctor's order prior to placing the Plaintiff on light duty. Certainly, "[s]ignificant, unexplained or systematic deviations from established policies or practices can . . . be relative and probative circumstantial evidence of [unlawful] intent." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (quoting *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). But here, the record is unclear as to whether the Defendant deviated from its internal policies, let alone deviated in a "[s]ignificant, unexplained or systematic" fashion. *Id.* At trial, when asked what job

duty the Plaintiff was unable to perform, McQueen said the duty "to adequately work as a team member." (McQueen Test. 23.) Further, the Court received testimony that a light duty assignment does not require taking away an officer's firearm, (Nelson Test. 211), or the submission of a doctor's note (Hunter Test. 138).

Lastly, the Plaintiff argues that causation can be inferred from the Defendant's "more favorable treatment" of Hollis Burton, a FWPD patrol officer accused of driving under the influence of alcohol in September 2011. (Pl's Br. 10.) The Plaintiff notes that Burton was not assigned to light duty, despite the acknowledgments of Hunter and York that Burton's actions posed a threat to public safety. The Plaintiff does not show, however, that he and Burton engaged in "similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (internal quotation marks and citation omitted); *see also Peirick v. Univ.-Purdue Univ.-Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) ("[I]n deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness."). Again, the record indicates that the Plaintiff engaged in a pattern of unusual behavior over an extended period of time. In contrast, at trial, Hunter offered undisputed testimony that he knew of no other "behavior in connection with [Burton's] service as a police officer that caused [him] to question [Burton's] fitness for duty." (Hunter Test. 149.) As such, the Court draws no inference of retaliation here, or for any other reason cited by the Plaintiff.

Accordingly, after observing the witnesses at trial and reviewing the trial exhibits, transcripts, and briefing submitted by the parties, the Court finds that the Plaintiff has failed to

show, by a preponderance of the evidence, a causal connection between his statutorily protected

activity and his assignment to light duty.


## CONCLUSION

For the reasons stated above, the Court enters judgment in favor of the Defendant.

SO ORDERED on September 14, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT